Tina Wolfson, SBN 174806
*twolfson@ahdootwolfson.com*
Theodore W. Maya, SBN 223242
*tmaya@ahdootwolfson.com*
Christopher E. Stiner, SBN 276033
*cstiner@ahdootwolfson.com*
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, California 90024
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL DEVANEY, NICHOLAS ARRIETA, and SARA YBERRA, individually and on behalf of all others similarly situated, | Case No. 5:20-cv-04130 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| GOOGLE LLC and ALPHABET INC., | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

Plaintiffs Michael Devaney, Nicholas Arrieta, and Sara Yberra (collectively, "Plaintiffs"), acting individually and on behalf of all others similarly situated, bring this action for damages and equitable relief under the Sherman Act, 15 U.S.C. § 2, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. against Defendants Google LLC and Alphabet Inc. (collectively, "Google").

## NATURE OF THE CASE

1.    Google has achieved an illegal monopoly by eliminating competition in digital display advertising. Specifically, Google gained dominance in the display advertising ad tech stack through acquisition of competitors, exclusivity provisions, interoperability/compatibility design choices, and development of its analytics services. With its ability to track millions of users across millions of sites and apps, other publishers cannot compete with Google's informational advantage.

2.    Google's market power in search and display has allowed it to charge supra-competitive prices to advertisers. Although online ad auctions can be designed to drive prices to competitive levels, Google's role in running the auctions on behalf of both buyers and sellers (including when Google itself is the seller, as it is for its Google search supply and for YouTube and its other properties) gives it the incentive and ability to bias auction prices.

3.    In the digital advertising market, it is nearly impossible to advertise online except through Google's advertising services. Resulting harms include higher advertising prices, higher consumer prices, decreased revenue for online newspapers and other web publishers, and overall reduced competition in the buying and selling of digital advertising. Consumers, of course, ultimately suffer the consequences of any abuse of market power by Google. When Google charges supra-competitive prices to advertisers, those excessive payments lead to an increase in the price consumers pay for goods and services throughout the economy.

4.    Plaintiffs, like other class members placed advertisements online through Google as an intermediary. Like other class members, Plaintiffs overpaid and suffered

economic loss resulting from Google's monopoly in relevant markets, and therefore seek damages and injunctive relief.

### PARTIES

5. Plaintiff Michael Devaney is a Sarasota, Florida resident who purchased digital advertisements from Google during the class period for his supermarket website and photography business.

6. Plaintiff Nicholas Arrieta is a Miami, Florida resident who purchased digital advertisements from Google during the class period for his online website selling bicycle hardware and related retail.

7. Plaintiff Sara Ybarra is a Spokane, Washington resident who purchased digital advertisements from Google during the class period for her moving business.

8. Defendant Google LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Mountain View, California. Google LLC is a technology company that provides internet-related services and products, including online advertising technologies and a search engine

9. Defendant Alphabet Inc. is a corporation organized under the laws of Delaware with its principal place of business in Mountain View, California. Google LLC is a wholly owned subsidiary of Alphabet.

### JURISDICTION AND VENUE

10. This Court has original jurisdiction over Plaintiffs' federal antitrust claim under Clayton Act, 15 U.S.C. § 15. The court also has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) because at least one class member is of diverse citizenship from Defendants, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

11. This Court may exercise jurisdiction over Google because Google's principal place of business is located within this District. Google has established sufficient contacts in this District such that personal jurisdiction is appropriate.

12.     Venue is proper in this District under 28 U.S.C. § 1391. Google's principal place of business is in this district and it regularly conducts business here. A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

13.     Assignment is proper to the San Jose Division of this District under Local Rule 3-2(c)-(e), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Santa Clara County.

## FACTUAL ALLEGATIONS

### A. Digital Advertising Background

14.     Advertising campaigns used to be planned and managed by media buyers. If that media buyer needed to help a toy manufacturer reach parents of children, she might place an ad in *Parents Magazine*, or in the family section of the local newspaper. Advertising used to be something that could be placed, counted, then seen in the front cover spread of a magazine.

15.     This is not how digital advertising works today. Digital advertising is automated and data-driven, involving data scientists, mathematicians, and computer programmers who, behind the scenes, use advanced statistical tools to optimize advertising campaigns, by micro-targeting users and constantly tweaking algorithms.

16.     In the US, $125 billion was spent on digital advertising in 2019, accounting for over half of total ad spending.[1]

17.     The two big contenders in digital advertising are search and display advertising.

18.     Search advertising is a service that businesses pay for to show up in search results on search engine result pages, predominately Google Search. Because the audience is targeted to those who are actually searching for a product or service, an

---

[1] *See* https://www.iab.com/wp-content/uploads/2020/05/FY19-IAB-Internet-Ad-Revenue-Report_Final.pdf.

CLASS ACTION COMPLAINT, CASE NO. 5:20-cv-04130

advertiser only pays when the user clicks on the ad. For example, if a user searches for sandwich delivery, the search advertising results looks something like this[2]:



19.     Search advertising is designed to reach customers who have already shown an interest in purchasing a product or service and may be close to making a purchasing decision. Search advertising is attractive to local or small businesses not seeking to reach a broad audience. For example, if a citizen finds himself in need of a plumber, and searches for plumbers on Google, search advertising will place ads for local plumbers above the organic search results.

20.     The downside to search advertising for advertisers themselves is that they have to wait for someone to search for their product or service in order to direct prospective customers to their business.

_____

[2] *See* https://www.disruptivestatic.com/wp-content/uploads/2018/02/sandwich-delivery-google-search.jpg.

21.    Suppliers of display advertising are known as publishers (e.g. online newspapers and other content creators). Publishers employ third party tools to find advertisers and sell advertising space available on their websites.

22.    Display advertising is the advertising that appears alongside content on publishers' websites. For example, an ad for *Dove* might appear on a cooking website, "myrecipes" as a banner or a side bar[3]:



Or as side bar ads, like this:

 

23.    In display advertising, an active search for the particular product by the internet user is not required; but the key to effective display ads is that they are placed on websites likely to be viewed by the advertiser's target audience and/or those most likely to purchase the advertised products or services.

24.    $38.1 billion was spent on display advertising in 2019 in the US, representing a 13.8% increase from 2018.[4] In 2020, spending on display media is

---

[3] *See* https://www.disruptiveadvertising.com/adwords/google-display-network.
[4] *See* https://www.iab.com/wp-content/uploads/2020/05/FY19-IAB-Internet-Ad-Revenue-Report_Final.pdf.

CLASS ACTION COMPLAINT, CASE NO. 5:20-cv-04130

expected to hit $41.9 billion, with a 15.1% year-over-year increase, again outpacing search advertising.[5]

25.     Outside of Google, Facebook, and a few others, the rest of the market, which includes thousands and thousands of independent news publishers (that depend on digital advertising as their primary source of revenue), will shrink by 11 percent.[6]

26.     Search advertising and display advertising serve different purposes. Advertisers do not regard them as substitutes for each other. The Interactive Advertising Bureau separates display and search categorically for annual revenue analysis purposes.

**B. Google Dominates Both Search and Display Online Advertising Services**

27.     Alphabet's total ad revenue in 2019 was $133 billion, making up 82% of total revenue.[7] Google is estimated to have captured 37.2% of all U.S. digital ad spend in 2019.[8]

28.     Google's revenue from display ads comes from ads placed on Google's own properties (Google Maps, Gmail, etc.) and ads placed with third party publishers (digital versions of newspapers, online content creators, etc.). Google sells ad space on third party websites to advertisers as an intermediary.

29.     When an ad is viewed through a third-party publisher, for example, *The Washington Post*, Google pays the publisher a portion of the price that the advertiser paid to Google for its ad placement services. The portion Google keeps is the "take rate", or difference between what advertiser pays and publisher receives. Google's take rate is estimated to be about 40%.[9]

30.     Google has an incentive to increase ads placed on its own property sites because Google does not have to share the collected price of the ad with a third-party publisher.

---

[5] *See* https://www.marketingcharts.com/advertising-trends/spending-and-spenders-111801.
[6] *See* https://app.hubspot.com/documents/4934439/view/35422028?accessId=bc7916.
[7] *See* https://abc.xyz/investor/static/pdf/2019Q4_alphabet_earnings_release.pdf.
[8] *See* https://www.emarketer.com/content/google-maintains-wide-lead-in-net-us-search-ad-revenues.
[9] *See* https://www.gov.uk/cma-cases/online-platforms-and-digital-advertising-market-study#interim-report.

CLASS ACTION COMPLAINT, CASE NO. 5:20-cv-04130

### 1.  Google's Search Advertising Practices and Market Share

31.    Google by far holds the highest share of search advertising revenue in the U.S. In 2019, its share was 73%.[10]

32.    Google makes space on its search result pages available to advertisers through an auction process that occurs each time a user runs a search. Google starts the auction by first finding all the ads with keywords matching the search. Google then only displays ads with sufficiently high "rank" based on factors like the advertiser's bid, quality of the ad, user location, and type of device user is using. The auction process is repeated for every search performed on Google Search, so different searches may lead to different auctions, which may lead to different advertisements being displayed.

33.    Although Google claims its prices are set via auction, Google controls and frequently raises the price of its search advertising by setting a high reserve price. (An ad will not sell if it does not meet the reserve price.) A majority of winning bids are just at the reserve price.

### 2.  Google's Dominance in the Ad Tech Stack and Display Advertising

34.    Google is a major supplier of display advertising and owns multiple products that supply it such as YouTube, Google Maps, and Google Play.

35.    When an internet user visits a website, in the milliseconds that it takes for that page to load, there are real-time auctions running in the background that determine which ads to display on *that particular user's* page. These auctions are run by SSPs and DSPs in the ad tech stack as described below.

36.    Suppliers (online publishers) of display advertising employ publisher ad servers (PAS) to accept, store, and manage ads, choose where and when ads appear, and track the effectiveness of ad campaigns. The placement of ads is determined based on bids from advertisers and/or arrangements publishers have with the advertisers.

---

[10] *See Id.*

37.     Suppliers of ad space/publishers rely on supply side platforms (SSP) to run auctions, interface directly with advertisers, and optimize available supply ad-space inventory.

38.     The advertisers (or market demand side) rely on advertiser ad servers (AAS) to store ads, deliver them to publishers, and records transactions. Advertisers also employ demand side platforms (DSP) to purchase digital advertising by bidding in auctions.

39.     Together, the PAS, SSP, AAS, and DSP comprise the ad tech stack. By connecting publishers and advertisers, an ad tech provider functions as an intermediary, similar to a broker.

40.     Until fairly recently, different firms provided various services in the ad tech stack, and intermediaries did not own the publisher or advertise. This is no longer the case – After a series of acquisitions, Google now dominates and controls the ad tech stack.  Since 2007, Google has made at least nine key acquisitions in the interest of gaining control of the entire ad tech stack.

41.     Google purchased a publisher ad server in 2007 called DoubleClick, for example; the technology from that company served as the basis for Google's current publisher ad server. It acquired AdMob in 2009; AdMob owned technology for serving ads on apps. It purchased Invite Media in 2010, which Google developed into its main demand side platform. In 2011, it purchased AdMeld, a supply side platform that it integrated into AdX, the Google exchange. And in 2014, Google bought Adometry, an analytics and attribution provider it then integrated into Google Analytics. Together, these acquisitions reveal a sustained effort to occupy the entire ad tech stack as well as the related analytics market through mergers.

42.     In the supply of advertising space, Google now holds at least 90% of the PAS market through multiple products such as Google Ad Manager and Google Double Click for Publishers. Google's AdX product alone holds about 50% of the SSP market.

43.     Likewise, on the advertiser-demand side, Google controls a substantial majority of the DSP market (reportedly over 62%) and holds a substantial share of AAS market.

44.     By consolidating key portions of the ad tech stack for display advertising, Google can now readily broker transactions on both sides and steer advertisers to its own digital display platforms. Google's acquisitions and access to every level of display advertising service industry have enabled Google to eliminate competition through a variety of anticompetitive policies and activities.

45.     Publishers and advertisers have little choice but to go through Google's services.

46.     For example, Nexstar Media Group Inc., the largest local news company in the U.S., tested what would happen if it stopped using Google's technology to place ads on its websites. Over several days, the company's video ad sales plummeted. "That's a huge revenue hit," said Tony Katsur, senior vice president at Nexstar. After its brief test, Nexstar switched back to Google.[11]

## C. Google Has Used its Dominance as a Search Engine and Other Products to Create and Maintain a Monopoly for Display Advertising Services

### 1.  Google's Dominance as a Browser and the Significance of User Data

47.     Google has an enormous advantage over advertisers and publishers due to sheer volume of information it obtains about consumers. As former CEO Eric Schmidt boasted, "We know where you are. We know where you've been. We can more or less know what you've been thinking about."[12]

48.     Online advertising is more effective when it is targeted, displaying products or services a user is likely to want. Accordingly, user data including gender, age, location, and browsing history influences not just the type of ads a user will see, but also price advertisers are willing to pay. "The exact same ad, on the same website, at the same time,

---

[11] See https://www.wsj.com/articles/how-google-edged-out-rivals-and-built-the-worlds-dominant-ad-machine-a-visual-guide-11573142071.

[12] *See* https://techcrunch.com/2010/09/07/eric-schmidt-ifa.

CLASS ACTION COMPLAINT, CASE NO. 5:20-cv-04130

could be worth vastly different amounts to two different buyers depending on how much they know about the consumer being targeted," explains Ari Paparo, now founder and CEO of advertising company Beeswax and a former Google executive "User data is everything."

49.     The prices that any company is able to fetch for its ads depend on two crucial factors: the ability to identify *who* is loading the page, and the ability to then connect the user's identity with more information about the user.

50.     The targeting of display ads begins the moment a reader visits any website. Typically, the reader's IP address, location, and the URL of the page the reader visits are swiped from the reader's browser without their explicit knowledge. This information is used to run these ad auctions. The goal is to build as specific a portrait about the reader as possible—by linking their device with their identity—and cookies are a common tool for doing so.

51.     Google has acted to make it harder for its competitors to obtain similar information. In early 2020, for instance, Google announced that it would "phase out" third-party cookies that helped advertisers target consumers based on demographics, past browsing history, and other information. Without third-party cookies, it is much harder for advertisers and competitors to efficiently bid on ads. That is not true for Google, which continues to have other sources for gleaning robust data on consumers.

52.     If a company that sells online ads can know what their readers are reading on *other* sites, then they can target the users based on that information when the user returns to their own site. To illustrate the supreme advantage of Google over any other publishers, let's consider two hypothetical online publishers, CNBC and *The New York Times.* For example, say Michael visits CNBC's website in the mornings and reads about the markets, but visits *The New York Times* in the evenings and only reads the book review section. CNBC knows Michael is someone who follows the markets and might monetize his view at a $30 CPM (cost per thousand). The *Times* knows that Michael is someone who likes to read books so might only monetize Michael at a $10 CPM. If

the *Times* can somehow find out that Michael is reading CNBC in the mornings, then when Michael visits the *Times* book section in the evening, the *Times* can target him as someone who follows the markets and monetize him at $30, too.

53.     Would CNBC want to share with the *Times* what Michael reads on cnbc.com? Of course not. The two are competitors on the advertising side of the market. If CNBC is selling its audience of financial readers at a cost of $30, and the *Times* can copy CNBC's readers and their reading patterns, then the *Times* could theoretically undercut CNBC and sell ads targeted to CNBC financial readers for, say, $20 instead of $30.

54.     But publishers like the *Times* and CNBC have no choice but to share this information with Facebook and Google.

55.     Google, which now tracks users on over 70 percent of the top one million sites, also uses its ability to track users across the internet to extract an advantage in advertising markets.[13] Google tracks users via its analytics and ad-serving products, which Google consolidated and rebranded as the Google Marketing Platform.

56.     Google runs auctions through which publishers now sell their own advertising. Unlike in finance, there are several auction markets where digital ads trade. Anyone can create one. But Google ensures its own advertising inventory (e.g. YouTube) can only be bought through their *own, proprietary* auctions. Google made almost $20 billion last year from selling other companies' ads.[14] This is why Google today is the largest seller of advertising, globally, period.

### 2.  Google's Unfair Practices in Search Products

57.     Google operates the default internet search platform in the United States; at least 90% of all internet searches are conducted through Google Search. Consequently, Google is the dominant source for search advertising. Companies seeking to promote their products or services online are de facto required to purchase search advertising space

---

[13] https://www.cs.princeton.edu/~arvindn/publications/OpenWPM_1_million_site_tracking_measurement.pdf.

[14] See https://abc.xyz/investor/static/pdf/20180204_alphabet_10K.pdf?cache=11336e3.

CLASS ACTION COMPLAINT, CASE NO. 5:20-cv-04130

from Google. Google has taken advantage of this dominance in the search advertising market to drive out competition in the separate market for display advertising services.

58. When a Google Ads account is established for use in placing search advertisements, Google Ads is set as the default account for placing both search and display advertisements. And to disadvantage rivals, Google restricts access to data concerning web searches performed on Google Search.

59. When consumers run Google searches, Google collects and retains data related to the searches. DSPs and advertisers use this information to craft more effective advertising campaigns. Google, however, withholds this information from rival DSPs and advertisers using rival service providers. The result of this policy is that, in order to gain access to the search data over which Google has monopoly control, an advertiser must agree to use Google's products in the separate display advertising services market.

60. For example, GoogleAds, (a DSP) relies on algorithms that match keywords selected by advertisers to user search terms in order to determine which searches would be good matches for which search ads.

61. Google similarly uses its dominance in the video-ad publishing market segment to coerce advertisers to use Google's display advertising services. Google-owned YouTube runs up to 50% of all video display ads not appearing on Facebook and Amazon. After Google purchased YouTube, it initially made YouTube's inventory of display advertisements available to any advertising service provider. But in 2015, Google prevented non-Google advertising service providers from purchasing advertising space on YouTube. As a result, if an advertiser wants to purchase any of the valuable advertising space on YouTube, it must use Google's advertising services and cannot use any of Google's rivals' advertising services.

62. In addition to its ad tech stack services, Google offers Ads Data Hub (ADH) which allows advertisers to view data from ad campaigns, which users were reached by search ad campaigns, and combine the data with third party data to adjust display ad

strategy. However, ability to use the data has a built-in restriction in that the data can only be sent to another Google service and cannot otherwise be exported.

63.     By conditioning advertiser access to Google search data and YouTube's advertising platform on the purchase of Google's advertising services, Google effectively forces advertisers to use Google for all aspects of their campaigns.

### D. Other Forms of Anticompetitive Conduct

64.     Google conceals key information from publishers and advertisers in acting as an intermediary. Parties on both sides of the transaction are not aware of the price actually paid to Google for an ad placement. Studies have shown that about 15% of advertising transaction costs are unaccounted for.[15]

65.     Google generally maintains a culture of secrecy around its services, an indication of market power. Service providers in competitive markets generally must provide to their customers detailed accounts of services they provide to justify the prices they charge.[16]

66.     In 2016 Google launched AMP for the stated purpose of loading webpages faster on mobile devices. AMP pages are listed first in a search, encouraging publishers to use them. AMP sends users to content on pages hosted by Google, thereby denying content providers as much access to, and data about, their own users as they would normally get. This weakens the content providers in the long run, allowing Google's own properties to slowly gain a greater share of consumer attention. Although one might begin by characterizing content providers as complements, this creeping strategy by Google to

---

[15] PricewatershouseCoopers recently concluded a study in which it attempted to track various advertisers' payments through the ad tech stack. It concluded that a remarkable 15% of ad spend simply went missing somewhere between the advertisers and publishers: "15% of advertiser spend – an "unknown delta", representing around one-third of supply chain costs – could not be attributed." See Abi Gibbons, Time for change and transparency in programmatic advertising, ISBA MEMBER PORTAL (May 6, 2020), https://www. isba.org.uk/news/time-for-change-and-transparency-in-programmatic-advertising/. This study did not focus exclusively on Google's intermediation services but it nonetheless reflects the difficulty advertisers face when trying to understand where their money goes, which itself indicates the market is not working efficiently.

[16] https://www.omidyar.com/sites/default/files/Roadmap%20for%20a%20Case%20Against%20Google.pdf.

14

host content on its own pages—by a variety of methods—demonstrates that Google views content providers as competitors in the long run for the capture of ad dollars. Google doesn't want to develop content so that it wins more Pulitzer Prizes than the New York Times or the Washington Post; that is an expensive undertaking. Rather, Google wants to host that attractive content so it can capture the ad dollars that otherwise would go to those publishers. That is the reason it steers consumers to Google properties and away from content providers. That conduct constitutes foreclosure of horizontal competitors.

### E. Government Investigations into Google's Monopolistic Conduct

67.     In July 2019, the U.S. Department of Justice announced that it had opened an investigation into whether Google is committing illegal monopolistic acts. The DOJ stated that its probe would focus on whether and how Google and other leading online platforms "have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers."

68.     In September 2019, 48 state attorneys general, led by Texas Attorney General Ken Paxton, disclosed their own probe into whether Google is violating the antitrust laws. In announcing the investigation, Paxton referred to "evidence that Google's business practices may have undermined consumer choice, stifled innovation, violated users' privacy, and put Google in control of the flow and dissemination of online information."

69.     On May 15, 2020, the Wall Street Journal reported—based on information from "people familiar with the matter"—that both the DOJ and the state attorneys general likely will file antitrust lawsuits against Google as soon as the summer and are well into planning for such litigation. The Journal reported that "all signs point toward [the DOJ] bringing a case" and that "[m]uch of the states' investigation has focused on Google's online advertising business. The company owns the dominant tool at every link in the complex chain between online publishers and advertisers."[17]

---

[17] *See* https://www.wsj.com/articles/justice-department-state-attorneys-general-likely-to-bring-antitrust-lawsuits-against-google-11589573622?mod=searchresults&page=1&pos=17.

70.    Google has also faced regulatory action in Europe. The European Commission fined Google $2.7 billion in 2017 for rigging search results to favor its own online shopping portal and $1.7 billion in 2019 for dictating to other websites how they can display search results from Google's competitors.

71.    The U.K. is also considering limiting Google's ability to set self-serving defaults and enforcing data sharing and/or feature interoperability to help rivals compete in relevant markets. Of particular interest is forcing Google to separate its ad server arm from the rest of the business. The U.K.'s Competition and Markets Authority (CMA) launched the market study in July of 2019— a couple of weeks after the U.K.'s data watchdog published its own damning report setting out major privacy and other concerns around programmatic advertising. Based on initial findings from the study, it says there are "reasonable grounds" for suspecting serious impediments to competition in the online platforms and digital advertising market.

The report specifically flags three areas where it suspects harm — namely:

- **the open display advertising market** — with a focus on "the conflicts of interest Google faces at several parts of its vertically integrated chain of intermediaries";

- **general search and search advertising** — with a focus on "Google's market power and the barriers to expansion faced by rival search engines";

Other concerns raised in the report include problems flowing from a lack of transparency in the digital advertising market; and the difficulty or lack of choice for consumers to opt out of behavioral advertising.[18]

72.    In December 2019, France's competition authority fined Google $166 million following a lengthy investigation into Google's online advertising practices. France sanctioned Google for adopting "opaque and difficult to understand" rules for its ad platform and for applying them in an "unfair and random manner." According to

---

[18] *See* https://techcrunch.com/2019/12/18/uks-competition-regulator-asks-for-views-on-breaking-up-google.

TechCrunch, the French governing body also found that "another element of Google ad rules could lead sites to favor a content policy aligned with its own ad-funded services—thereby pushing online publishers to adopt an economic model that deeds and benefits its own." The French governing body summarized its bases for fining Google as follows:

> [T]he French Competition Authority considers that the Google Ads operating rules imposed by Google on advertisers are established and applied under non-objective, non-transparent and discriminatory conditions. The opacity and lack of objectivity of these rules make it very difficult for advertisers to apply them, while Google has all the discretion to modify its interpretation of the rules in a way that is difficult to predict and decide accordingly whether the sites comply with them or not. This allows Google to apply them in a discriminatory or inconsistent manner. This leads to damage both for advertisers and for search engine users.

## IMPACT ON INTERSTATE TRADE AND COMMERCE

73.    Google's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

74.    At all material times, Google participated in the marketing, promotion, distribution, and sale of publication and advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

75.    Google's conduct also had substantial intrastate effects in that, among other things, Google's publication and advertising services for display advertisements were sold in each state, including California. At least thousands of individuals in each state, including California, were impacted by Google's anticompetitive conduct. As alleged below, absent Google's unlawful conduct, Plaintiffs and class members within each state, including California, would have paid less for digital advertising services.

## RELEVANT MARKETS

76.    Google's anticompetitive conduct has restrained competition in the market for digital advertising services (encompassing the overall process that connects

advertisers and publishers, including Google) as well as in several distinct markets within this larger market.

77.     Google used its dominant position in search and search advertising in the United States to restrict competition in the market for search advertising services. Google also has established itself as the dominant provider in the broad market for display advertising services (encompassing all of the various steps that are necessary to facilitate placement of digital advertisements into the available supply of display advertising space made available by publishers).

78.     Google has also monopolized each of the relevant submarkets of the overall market for digital advertising services, including the broader markets for search advertising services and display advertising services, and the subsidiary markets for publisher ad servers, supply side platforms, demand side platforms, and advertiser ad servers. Its conduct had the intent and effect of suppressing competition in the search and display advertising services markets as well as in each of their component submarkets.

79.     Google has branded its market power to integrate each component of digital display advertising services (PAS, DSP, AAS, SSP) into a single set of bundled services to prevent or discourage competitors (i.e., other display advertising service providers), publishers, and advertisers from selecting advertising service providers on a component-by-component basis. In short, Google's anticompetitive activity has frustrated the ability of each segment of the display advertising services process to function as a free and independent market.

80.     There is no substitute for search advertising services or display advertising services. While advertisers and publishers can theoretically connect directly to buy and sell ad space and ads respectively, the vast majority do not for reasons of high inefficiency costs and are thus extremely dependent on third party services such as those Google provides. Furthermore, advertisers and publishers have become beholden to the vast, unmatched user data resources that only Google can provide.

81.     There are high barriers to entry for the search advertising services market, the display advertising market, and the component display advertising submarkets. Entering any of these markets requires a substantial investment to develop and implement the technology necessary to compete. Google's conduct, such as leveraging its internet search platform dominance and denying interoperability in several respects, as described above, has made it exponentially more difficult for would-be market participants to effectively enter these markets and compete with Google. Google has accordingly used its market dominance to ensure that market entry by would-be competitors is infeasible. And Google's conduct has made it impractical for existing market participants to compete, which has resulted in large numbers of companies exiting the relevant markets.

82.     The digital advertising services markets (services that facilitate ad sale transactions) are distinct from the advertisement inventory markets (spaces on websites that publishers make available for advertisers to purchase). At least thousands of companies act as publishers with display advertisement inventory, but in general, these companies do not offer the services that facilitate placement of advertisements into the supply of display advertising space. Only a few companies—Google chief among them—provide display advertising services.

83.     Similarly, although Facebook and Amazon also display a large amount of advertising content, they are not competitors in the brokering of ad sale transactions on the open web. They do not operate in the same display advertising services market as Google connecting independent entities—advertisers and publishers. Advertisers use display advertising services to gain access to a range of publication options. Publishers, in turn, use display advertising services to access a range of potential advertisers. Google operates in an open-ended market in which it facilitates the transactions between advertisers and publishers. Companies like Facebook and Amazon, by contrast, have their own in-house display advertising systems that they use to publish advertisements on their websites. An advertiser wishing to advertise on websites other than Facebook and Amazon would need to use display advertising service like Google's. The advertising

services offered by Facebook and Amazon are not, therefore, reasonable substitutes for the system that Google offers.

## ANTITRUST IMPACT

84.    The purpose and effect of Google's conduct was to prevent competition in the relevant markets. Absent Google's conduct, each component of the digital advertising market would have been more competitive and class members would have financially benefited from the increased competition.

85.    More vigorous competition would have benefited both the advertisers and the publishers that use digital advertising services.

86.    Firms that provide digital advertising services make money in a variety of ways, including by retaining the difference between (1) what an advertiser pays the provider to place ads, and (2) the portion of that payment that the provider remits to a publisher for placing the ads on its website. With increased competition, advertisers would have paid less to have their ads placed, and publishers would have received more for placing the ads on their websites. But with Google stifling

87.    competition and extracting monopoly rents as the dominant intermediary, both advertisers and publishers lost money. The decrease in competition caused by Google's conduct has thus harmed Plaintiffs and class members in their business and property because advertisers have paid more than they otherwise would have and publishers have been paid less than they otherwise would have.

## TOLLING OF STATUTE OF LIMITATIONS

### A. The Statutes of Limitations Never Began to Run Because Plaintiffs Did Not and Could Not Discover Their Claims.

88.    Plaintiffs and class members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

89.    Plaintiffs and class members paid for digital advertising at artificially inflated prices or otherwise suffered economic loss as a result of Google's wrongful

exercise of monopoly power in the relevant market. Other than dealing directly with Google when using its digital advertising services, Plaintiffs had no means from which they could have discovered its wrongful conduct.

90.     Throughout the class period, and continuing thereafter, there was no information in the public domain sufficient to put Plaintiffs and class members on notice that Google had wrongfully acquired a digital advertising monopoly or was using its monopoly power to charge supra-competitive digital advertising prices.

91.     Because digital advertising is subject to antitrust regulation, it was reasonable for Plaintiffs and class members to presume that digital advertising was sold in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect digital advertising was being sold at supra-competitive prices at any time during the class period.

92.     Given the imbalance of power and knowledge, it was reasonable for Plaintiffs and class members not to suspect that Google was engaging in any unlawful anticompetitive behavior.

93.     Plaintiffs allege a continuing course of unlawful conduct by Google, including conduct within the applicable limitation periods. That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

94.     For these reasons, the statutes of limitations applicable to Plaintiffs' and class members' claims have been tolled with respect to the claims asserted herein.

**B. Google's Fraudulent Concealment Tolled Statute of Limitations.**

95.     Additionally, the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. Google concealed its illicit conduct, both by failing to disclose its wrongful acquisition and maintenance of a digital advertising monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct.

96.     Google has repeatedly publicly denied allegations by U.S. and foreign regulators that it was abusing its market power in the digital advertising market. When

the French Competition Authority fined Google $166 million in late 2019, Google publicly defended its policies as purportedly needed to "protect [people] from exploitative and abusive ads." Similarly, in response to recent news reports of impending antitrust actions against it by federal and state officials for monopolization, Google stated publicly that "[c]ompetition is flourishing, and publishers and marketers have enormous choice" which was plainly false.

97.     Google's anticompetitive monopoly conduct was inherently self-concealing because Google knew, its disclosure likely would have led to governmental enforcement activity or civil liability. Because Google's antitrust violations were self-concealing and affirmatively concealed by Google, Plaintiffs and class members had no knowledge of Google's antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Google of having wrongfully acquired and maintained monopoly power during the class period. Therefore, the statutes of limitations applicable to Plaintiffs' and class members' claims were tolled throughout the class period by operation of Google's fraudulent concealment.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs bring this lawsuit individually and as a class action on behalf all others similarly situated pursuant to Federal Rules of Civil Procedure ("Rule") 23(a), (b)(2), and/or (b)(3).   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23. The Nationwide Class is defined as:

> All persons and entities in the United States that, from January 1, 2016 to the present, used Google's digital advertising services to (1) place an ad on a website operated by another entity (advertisers) or (2) place an ad from a third party on their own website (publishers).

99.     Excluded from the Class are the following persons and entities: Google, any entity or division in which Google has a controlling interest, and its legal representatives, officers, directors, assigns, and successors and the Judge to whom this case is assigned

and the Judge's staff.   Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

100.   <u>Numerosity</u>: Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court.  The Class members are readily identifiable from information and records in Google's possession, custody, or control.

101.   <u>Typicality</u>: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class members, advertise or advertised on another entity's website or publish or published ads from a third party on their own website.  Plaintiffs, like all Class members, have been damaged and will continue to be damaged by Google's unfair business practices and monopolization of digital advertising service markets.

102.   <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any individual questions.   These common legal and factual issues include the following:

     a.   Whether  Google  holds  monopoly  power  in  digital  advertising  service markets;

     b.   Whether, Google unlawfully acquired and maintained monopoly power in digital advertising service markets;

     c.   Whether  Google  engaged  in  unfair  business  practices  that  reduced competition in digital advertising service markets;

     d.   The  amount  of  damages  owed  the  class  as  a  result  of  Google's  illegal activity;

     e.   The form and content of injunctive relief;

103.   Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Google acted

on grounds generally applicable to the class as a whole. For the same reason, class certification for purposes of adjudicating Plaintiffs' claims for injunctive relief is appropriate.

104.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class members.   Plaintiffs have retained attorneys experienced in the prosecution of class actions, including antitrust class actions, and Plaintiffs intend to prosecute this action vigorously.

105.   <u>Predominance and Superiority</u>: Plaintiffs and Class members have all suffered and will continue to suffer harm and damages as a result of Google's unlawful and wrongful conduct.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy.   Absent a class action, Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.   Absent a class action, Class members will continue to incur damages, and Google's misconduct will continue without remedy.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**
**Violations of Section 2 of The Sherman Act**
**15 U.S.C. § 2**

106.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

107.   Google wrongfully acquired and unlawfully maintained monopoly power in the relevant markets through the conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals,

denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

108.   As a direct and proximate cause of Google's conduct, Plaintiffs and members of the class have suffered antitrust injury. Plaintiffs and the class members paid significantly higher prices than they would have but for Google's unlawful conduct. That conduct also deprived Plaintiffs and class members of improved quality and innovation in the relevant markets.

109.   Plaintiffs and members of the class are entitled to damages, including treble damages, sustained as a result of Google's monopolistic acts and practices.

110.   Plaintiffs and members of the class are entitled to equitable relief as appropriate to cure Google's monopoly conduct and restore competition in the relevant markets. Members of the class are regular users of digital advertising services and will continue to purchase such services and suffer further injury if Google's monopoly in digital advertising is not ended.

## SECOND CAUSE OF ACTION
### Violations of the California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq.*

111.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

112.   Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class against Google.

113.   California Business & Professions Code § 17200, *et seq.* ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

114.   Google's conduct is unlawful in violation of the UCL because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

115.   Google has engaged in unfair business practices through the conduct alleged herein, which has restrained competition. Google's conduct is unfair, in violation of the

UCL, because it violates California's clearly established public policy forbidding monopolistic acts. Google wrongfully acquired and unlawfully maintained monopoly power in the relevant markets through the conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

116.   Google's practices, acts, and omissions also are unlawful in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including in the form of artificially inflated prices, that greatly outweighs any possible utility from the practices.

117.   Google's conduct actually and proximately caused Plaintiffs and class members to lose money or property. On behalf of the class, Plaintiffs seek restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.

118.   As a direct and proximate result of Google's unfair and deceptive practices, Plaintiffs and Class members have suffered and will continue to suffer actual damages.

## **REQUEST FOR RELIEF**

Plaintiffs, individually and on behalf of all others similarly situated, request the Court enter judgment against Google, and accordingly requests the following:

   A. An order certifying the proposed Class and designating Plaintiffs as the named representatives of the Class and designating the undersigned as Class Counsel, pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3);

   B. An order for injunctive relief to restore competition in the relevant markets;

   C. An award to Plaintiffs and Class members of compensatory, actual, exemplary, and statutory damages, including treble damages, as provided by law, and

restitution to the class in amount to be proven at trial, plus interest in accordance with law;

D. An award of attorneys' fees and costs pursuant to all applicable laws;

E. An award of pre-judgment and post-judgment interest, as provided by law;

F. Leave to amend the Complaint to conform to the evidence produced at trial; and

G. Such other relief as may be appropriate under the circumstances to redress the harm caused by Google's unlawful conduct.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a trial by jury as to all matters so triable pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

Dated: June 22, 2020

*/s/ Tina Wolfson*
Tina Wolfson, SBN 174806
*twolfson@ahdootwolfson.com*
Theodore W. Maya, SBN 223242
*tmaya@ahdootwolfson.com*
Christopher E. Stiner, SBN 276033
*cstiner@ahdootwolfson.com*
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, California 90024
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Attorneys for Plaintiffs*